IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 20–cv–00019–KMT

PETER RONNY DEHERRERA,

      Plaintiff,

v.

ANDREW SAUL, Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

Plaintiff Peter Ronny Deherrera ["Deherrera"] brings this action pursuant to the Social Security Act, 42 U.S.C. 405(g), seeking judicial review of a final decision by Defendant Andrew Saul, Commissioner of the Social Security Administration ["Commissioner"], denying his applications for disability insurance benefits and supplemental security income. (Doc. No. 1.) Plaintiff has filed an Opening Brief, and the Commissioner has responded. (["Opening Brief"], Doc. No. 19; ["Response"], Doc. No. 20.) No reply has been filed. The Commissioner has also filed the Administrative Record. (Social Security Administrative Record ["AR"], Doc. Nos. 12-13.) After carefully analyzing the briefs and the administrative record, the court AFFIRMS the Commissioner's final decision.

# BACKGROUND[1]

Deherrera was born on August 8, 1965; he was forty-four years old on the alleged disability onset date.  (AR 50-51, 60-61, 104, 108.)  He has a high school education, though he attended special education classes throughout his school years.  (AR 37-38, 161.)  His employment history includes positions as detention officer and a carpenter.  (AR 161.)

On May 29, 2012, Deherrera applied for disability insurance benefits, pursuant to Title II of the Social Security Act ["the Act"], and for supplemental security income, pursuant to Title XVI of the Act.  (AR 102-15.)  In both applications, Plaintiff claimed that he had been unable to work since March 30, 2010, due to a "heart condition;" "high blood pressure;" "arthritis: hips, ankles, wrists – swelling;" "degenerative disc disease;" "cancerous polups [sic] removed from colon;" "sleep apnea – on oxygen;" "knee replacements;" "shoulder – rotator cuff tear;" "memory loss;" "frequent dizziness;" and "poor vision."  (AR 50, 60, 160.)  The Commissioner denied Plaintiff's applications on November 13, 2012.  (AR 50-69.)  Plaintiff then successfully requested a hearing before an administrative law judge ["ALJ"], which took place on March 27, 2014.  (AR 29-49, 76-97.)  On April 16, 2014, the ALJ issued a written decision denying benefits, and on November 4, 2015, the Appeals Council denied Plaintiff's request for review of the ALJ's decisions.  (AR 1-6, 14-28.)

Plaintiff thereafter filed a complaint in federal court, seeking review of the Commissioner's decision.  Complaint, *Deherrera v. Colvin*, No. 1:15-cv-02658-KLM (D. Colo. Dec. 9, 2015).  On March 27, 2017, the court reversed and remanded the case, pursuant to

[1] The following background focuses only on the elements of Plaintiff's history that are relevant to the court's analysis.

sentence four of 42 U.S.C. § 405(g), for further administrative proceedings.  (AR 1041-57.)  On

remand, the Appeals Council vacated the Commissioner's decision, and returned the case to an

ALJ for further proceedings consistent with the court's order.[2]  (AR 1059-63.)  A hearing was

then held, on April 17, 2018, before a different ALJ, who then issued a written decision, on July

20, 2018, once again denying Plaintiff's claims for benefits.  (AR 981-1018.)

On August 15, 2018, Deherrera filed another complaint in federal court, seeking judicial

review of the Commissioner's second decision.  Complaint, *Deherrera v. Comm'r, Soc. Sec.*

*Admin.*, No. 1:18-cv-02081-WYD (D. Colo. Aug. 15, 2018).  The Commissioner then filed a

motion to remand the case for a second time, on December 14, 2018, pursuant to sentence four of

42 U.S.C. § 405(g).  (AR 1578-84.)  That motion was then granted on December 17, 2018.  (*Id.*)

On second remand, the Appeals Council again vacated the Commissioner's decision and

returned the case to an ALJ for further proceedings consistent with the court's order.[3]  (AR 1585-

---

[2] Specifically, the Appeals Council directed the ALJ to "offer the claimant the opportunity for a hearing and address the additional evidence submitted, take any further action needed to complete the administrative record and issue a new decision."  (AR 1061.)

[3] On second remand, the Appeals Council directed the ALJ to: (1) "[c]onsider the pertinent issues *de novo*;" (2) "[o]btain additional information concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence;" (3) "[i]f warranted and available, obtain evidence from a medical expert related to the nature and severity of and functional limitations resulting from the claimant's impairments;" (4) "[f]urther evaluate the claimant's medically determinable impairments including carpal tunnel syndrome to determine to what extent they limit the claimant's ability to perform work activities;" (5) "[g]ive further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations;" (6) "[g]ive further consideration to whether the claimant has past relevant work and, if so, can perform it;" and (7) "[i]f warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base[.]"  (AR 1588-89.)

91.)  A hearing was then held, on October 16, 2019, before ALJ William Musseman.  (AR 1536-58.)  Plaintiff appeared and testified at the hearing, accompanied by his attorney.  (AR 1536, 1539-54, 1557-58.)  The ALJ also heard testimony from a vocational expert.  (AR 1536, 1554-57.)  Medical evidence and opinions were provided by a non-examining state agency physician, Kent Kreider, M.D.; two treating physicians, Amy Carpenter, D.O. and Joseph Quintana, M.D.; and a treating nurse, Laura Smith, M.S.N., F.N.P.  (AR 1525-26; *see* AR 55-57, 65-67, 425, 975-80, 1754-56, 1759-61.)

At the 2019 hearing, the ALJ heard testimony from Plaintiff regarding his impairments.  Deherrera testified that he suffers from chronic shoulder pain, caused by bursitis.  (AR 1539-40.)  Plaintiff rated his pain from that impairment to be, on most days, "ten" out of ten.  (AR 1539.)  He told the ALJ that he had previously "received some injections" for the pain, but reported that the treatment proved ineffective.  (AR 1540.)  Deherrera further testified that he suffers from severe gout, which causes pain, swelling, and inflammation in his elbows, joints, hands, feet, and toes.  (AR 1548-49.)  Plaintiff also reported pain radiating bilaterally from his back to his feet, as well as from his neck to his arms.  (AR 1549.)  In addition, Deherrera testified that he suffers from carpal tunnel syndrome in both wrists, which causes severe pain and swelling in his hands.  (AR 1541.)  Plaintiff reported that he underwent right arm release surgery for that affliction, though he told the ALJ that the procedure was "not really" successful.  (*Id.*)  Deherrera testified that he also suffers from chronic bilateral hip, knee, and ankle pain.  (AR 1542, 1551.)  Plaintiff reported that he received injections for the hip pain, though he told the ALJ that the treatment only provides temporary relief.  (AR 1542.)  He told the ALJ that laying down also "helps relieve the pain a little bit."  (AR 1545.)  Deherrera further testified that, due to chronic

headaches, he experiences dizziness while standing, as well as blurred vision.  (AR 1544, 1552.)

In addition, Plaintiff reported that he suffers from chronic cellulitis, which causes stomach pain.

(AR 1550.)  Plaintiff testified that he also suffers from restrictive lung disease, which causes

shortness of breath and difficulty breathing, as well as sleep apnea, high blood pressure,

polycythemia, constipation, and heartburn.  (AR 1551-53.)  At the hearing, Plaintiff reported his

weight to be between 349 and 380 pounds.  (AR 1554.)

Deherrera further testified to the severity and debilitating effects of the impairments from

which he suffers.  Plaintiff reported that, due to shoulder pain, he is unable to lift his arms

overhead.  (AR 1540.)  He testified that he is unable to extend his arms forward, at all.  (*Id.*)

Plaintiff testified that, due to the pain in his hips, knees, and ankles, he can stand or walk,

continuously, for no more than fifteen minutes before he must rest.  (AR 1542-44, 1551.)  He

likewise reported that he can sit, continuously, for no more than thirty minutes before he must

stand or walk.  (AR 1544.)  Deherrera testified that, due to knee pain, he is completely unable to

kneel, squat, climb stairs, or climb ladders.  (AR 1545-46.)  He also reported difficulty counting

out change, due to cramping in his hands, though he admitted that he could tie his grandson's

shoes.  (AR 1549-50.)  Plaintiff reported that he is unable to lift items weighing more then ten

pounds.  (AR 1545.)  Deherrera testified that, in the event he over-exerts himself, he must lay

down for two or three days, on average, to recover.  (AR 1546.)  At the hearing, the ALJ

observed that Plaintiff was using a cane and supplemental oxygen.  (AR 1548, 1551.)  Deherrera

testified that he is unable to walk, at all, without the use of an assistive device.  (AR 1548.)

Plaintiff likewise reported that he has required supplemental oxygen for several years.  (AR

1551.)

Deherrera told the ALJ that he currently lives in a single-story house with his wife.  (AR 1546.)  Plaintiff testified that his two adult daughters, who live nearby, do all of the yardwork, drive him around, and assist his wife with the cooking.  (AR 1546-47.)  He testified that his wife "does everything" else related to cooking, cleaning, and grocery shopping.  (AR 1547.)

On November 4, 2019, the ALJ issued a written decision in accordance with the Commissioner's five-step, sequential evaluation process.[4]  (AR 1515-28.)  The ALJ determined, at step one, that Plaintiff had not engaged in substantial gainful employment since March 30, 2010, the alleged onset date.  (AR 1517 ¶ 2.)  At step two of his analysis, the ALJ found that Deherrera suffered from seven severe impairments: "sleep apnea, morbid obesity, gout, cellulitis, degenerative disc disease, osteoarthritis, and carpal tunnel syndrome."  (AR 1518 ¶ 3.)  The ALJ also found that Plaintiff suffered from several non-severe impairments, including chest pain, gastroesophageal reflux disease, hemorrhoids, high blood pressure, and polycythemia.  (*Id.*)  In

---

[4] The five-step sequential analysis requires the ALJ to consider whether a claimant: (1) engaged in substantial gainful activity during the alleged period of disability; (2) had a severe impairment; (3) had a condition that met, or equaled, the severity of a listed impairment; (4) could return to his past relevant work; and, if not, (5) could perform other work in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988); *see also McCrea v Comm'r of Soc. Sec.*, 370 F.3d 357, 360 n.3 (3d Cir. 2004) (observing that the same five-step sequential analysis applies to eligibility determinations for disability insurance benefits and supplemental security income).  It is well-settled that, under this analysis, the claimant has the burden to establish a *prima facie* case of disability at steps one through four. *Id.* at 751 & n.2.  The burden then shifts to the Commissioner, at step five, to show that the claimant retains sufficient residual functional capacity ["RFC"] to perform work in the national economy, given his age, education, and work experience.  *Id.*  A finding that a claimant is disabled, or not disabled, at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).  To be disabling, the claimant's condition must be so functionally limiting as to preclude any substantial gainful activity for at least twelve consecutive months.  42 U.S.C. § 423(d)(1)(A), (2)(A); *see Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995).

addition, the ALJ noted that Plaintiff alleged memory loss, as well as a recent stroke, but concluded that those were not medically determinable impairments.  (*Id.*)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 1518-19 ¶ 4.)

Prior to reaching step four, the ALJ assessed Deherrera's residual functional capacity ["RFC"], and found him capable of light work, subject to the following limitations:

> [T]he claimant can stand/walk up to four hours in [an] eight-hour workday and sit up to four hours in [an] eight-hour workday.  He can occasionally kneel and squat. He cannot climb ladders or scaffolds.  He can frequently, but not constantly, handle and finger.  He can occasionally do over chest level work.  He requires work with no hazardous work areas, temperature extremes or concentrated dust, smoke or chemicals.  He must be allowed to use a cane and oxygen while working.

(AR 1519 ¶ 5.)

In establishing this RFC, the ALJ evaluated Plaintiff's subjective allegations of pain, the objective medical evidence, and the opinion evidence.  (AR 1519-26.)   The ALJ determined that, while Deherrera's impairments could reasonably be expected to cause some of the alleged symptoms, his testimony regarding the intensity, persistence, and limiting effects of his conditions was "not entirely consistent with the medical evidence and other evidence in the record."  (AR 1520.)  The ALJ likewise concluded that the objective medical evidence, though reasonably suggesting that Deherrera "experienced some discomfort due to respiratory conditions, cellulitis, hemorrhoids, and other medical conditions," did not "show that these conditions were severe enough to prevent all work activity on March 30, 2010."  (AR 1521.)  In making that finding, the ALJ noted that Deherrera "was able to continue working, at least on a

part-time basis, as a deputy detention officer for several months afterward," and again, "starting

in May 2012." (AR 1521, 1523.)

In addition, the ALJ discussed the opinion evidence, first giving "significant weight" to

the 2012 opinion from non-examining state agency physician, Kent Kreider, M.D., to the extent

that the opinion "was consistent with the record as a whole, which showed morbid obesity, and

knee and back pain." (AR 1525; *see* AR 55-57, 65-67.) However, the ALJ found, "based upon

subsequent evidence admitted at the hearing level," that Plaintiff was presently "more limited"

than previously found by Dr. Kreider, "due to his history of carpel tunnel release, and ongoing

morbid obesity with chronic knee and back pain and respiratory issues." (AR 1525.) In

addition, the ALJ noted that Dr. Kreider's opinion did not account for Plaintiff's need for a cane

and supplemental oxygen while working. (*Id.*) The ALJ next considered an opinion from

Deherrera's treating physician, Amy Carpenter, D.O., dated December 12, 2013, which stated

that "manual labor will be nearly impossible for [Deherrera]." (AR 1525; *see* AR 425.) The

ALJ found that, even though Dr. Carpenter's opinion "did not explain what the claimant could

still do despite his impairments, or provide detailed physical or mental restrictions," the opinion

was nevertheless "consistent with the record as a whole," as well as "supportive of the [ALJ's]

finding that the claimant is limited to a range of light, or sedentary work." (AR 1525.) The ALJ,

therefore, "accept[ed]" the opinion, "insofar as it provides that the claimant cannot perform

heavy work." (*Id.*) In addition, the ALJ considered two opinions from Plaintiff's primary care

physician, Joseph Quintana, M.D.—respectively dated March 11, 2015, and April 18, 2018. (*Id.*;

*see* AR 975-80, 1754-56.) The ALJ assigned "little weight" to certain "extreme limitations" set

forth in Dr. Quintana's respective opinions, including that Plaintiff was precluded from all

postural activities, because those specific opinions were at odds with Dr. Quintana's own examination findings, as well as "the record as a whole, which shows conservative treatment and typically mild exam findings." (AR 1525-26.) Finally, the ALJ gave "little weight" to an opinion from treating nurse, Laura Smith, M.S.N., F.N.P., as the opinion was "rendered by a non-medically acceptable source;" "not consistent with the claimant's exam findings, his activities of daily living, or his treatment history;" and "not explained in any significant detail." (AR 1526; *see* AR 1759-61.)

At step four, the ALJ determined, based on the vocational expert's testimony, that Deherrera was unable to perform any past relevant work. (AR 1527 ¶ 6.) However, at the final step of his analysis, the ALJ found that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," based on his age, education, work experience, and residual functional capacity. (AR 1527-28 ¶ 10.) The ALJ determined that Deherrera would be able to perform such jobs as a photocopy operator, a non-postal mail clerk, and an office helper. (*Id.*) For that reason, the ALJ concluded that Deherrera was not under a "disability," as defined by the Act, and denied his applications for benefits. (AR 1528 ¶ 11.) That denial prompted Deherrera's request for judicial review. (Doc. No. 1; AR

## STANDARD OF REVIEW

In social security disability cases, the court's review is limited to determining whether: (1) substantial evidence supports the Commissioner's decision; and (2) whether the Commissioner's decision comports with relevant legal standards. *Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017); *see generally* 42 U.S.C. § 405(g). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (internal

citation omitted); *accord Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992) ("Evidence

is not substantial if it is overwhelmed by other evidence in the record or constitutes mere

conclusion.").  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See*

*Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000) ("We will not reweigh the evidence.").

A finding of "no substantial evidence" is proper only if there is a "conspicuous absence of

credible choices" or "no contrary medical evidence."  *Trimiar v. Sullivan*, 966 F.2d 1326, 1329

(10th Cir. 1992) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).  Further, "if the

ALJ failed to apply the correct legal test, there is ground for reversal apart from a lack of

substantial evidence."  *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

## ANALYSIS

Deherrera raises several issues on his present appeal.  Plaintiff argues, first, that the ALJ

erred at step three of the sequential evaluation process, by failing to find that Plaintiff's cardiac

condition met or medically equalled Listing 4.02 for Congestive Heart Failure.  (Op. Brief 36-

39.)  In his second argument, Deherrera contends that the ALJ "failed in his duty to develop the

record and adequately to explain the basis for his rejection of undisputed medical evidence."  (*Id.*

at 41.)  Specifically, Plaintiff complains that the record from the 2019 hearing is "sparse," with

respect to "the non-exertional effects" of his "many impairments," as well as "the devolving state

of his overall functioning."  (*Id.* at 40.)  Plaintiff likewise contends that the ALJ's written

decision, itself, contains "almost no narrative or explanation of the ALJ's reasoning beyond bare

dismissals or citations to other, often irrelevant, more normal results."  (*Id.*)  Next, Plaintiff

argues that the ALJ's RFC determination is not supported by substantial evidence, because the

ALJ failed to properly evaluate and weigh the 2018 opinion from his treating physician, Dr. Quintana.  (*Id.* at 42-46.)  Finally, Deherrera contends that the ALJ improperly evaluated his credibility and subjective complaints of pain.  (*Id.* at 46-48.)  On this issue, Plaintiff makes two arguments: (1) that the ALJ did not adhere to the proper framework to analyze his allegations concerning back pain and fatigue; and (2) that the ALJ's findings were not supported by substantial evidence.  (*Id.*)  The Commissioner insists, however, that the ALJ properly considered the entire evidentiary record, and followed the applicable law, in determining that Deherrera is not disabled.  (Resp. 1-17)

## I.  *Step Three Analysis*

Deherrera argues that the ALJ erred at step three of his analysis.  (Op. Brief 36-39.) Plaintiff contends, specifically, that the ALJ should have determined, at that step, that his impairments were of a medically equivalent severity to Listing 4.02 for Chronic Heart Failure. *See* 20 C.F.R. Part 404, Subpart P, App. 1, § 4.02 (2020).  (*Id.*)

"At step three, the ALJ determines whether the claimant's impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude substantial gainful activity."  *Drapeau v. Massanari*, 255 F.3d 1211, 1212 (10th Cir. 2001) (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)) (alteration omitted).  The ALJ must "discuss the evidence and explain why he found that [the claimant] was not disabled at step three."  *Clifton*, 79 F.3d at 1009.  However, it is the claimant's burden to establish that his impairments meet or medically equal a listed impairment.  *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005).  "For a claimant to show that his impairment matches a listing, it must meet *all* the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis

in original).  "An impairment that manifests only some of those criteria, no matter how severe, does not qualify."  *Id.*

Here, Plaintiff contends that the ALJ should have found that his impairments met or medically equaled Listing 4.02, which is the listing for chronic heart failure.  The requirements to meet or medically equal Listing 4.02 are as follows:

> 4.02 Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2.  The required level of severity for this impairment is met when the requirements in both A and B are satisfied.
>
> A.  Medically documented presence of one of the following:
>
> 1.  Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>
> 2.  Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);
>
> AND
>
> B.  Resulting in one of the following:
>
> 1.  Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or
>
> 2.  Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)), from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or
>
> 3.  Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a.  Dyspnea, fatigue, palpitations, or chest discomfort; or

b.  Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c.  Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d.  Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R., Pt. 404, Subpt. P., App. 1, § 4.02.

Here, Deherrera argues that he meets the criteria of paragraph A1, for systolic heart failure, based on the results from his 2019 Lexiscan myocardial profusion imaging ["MPI"] and echocardiogram testing.  (Op. Brief 38.)  Plaintiff likewise contends, albeit without citation, that "the record contains evidence that likely meets the requirements of" paragraph B.  (*Id.*)  Deherrera complains that, despite this evidence, "the ALJ failed to make any findings at all related to [his] cardiac test results and cardiac condition in 2019, even to find it to be non-severe."  (*Id.*)  Plaintiff is adamant that he was, at minimum, "entitled to have a medical expert review his cardiac records and present his or her opinion to the ALJ as to its applicability to" Listing 4.02.  (*Id.*)  However, the court disagrees.

Notably, the ALJ, at step three of his analysis, did not discuss Plaintiff's cardiac condition, or the extent to which that purported impairment was medically equivalent to Listing 4.02.  (*See* AR 1518-19.)  As such, the court agrees that the ALJ did not technically fulfill his obligation to "discuss the evidence and explain why he found that [the claimant] was not disabled at step three," with respect to this alleged condition.  *Clifton*, 79 F.3d at 1009; *see Dye*

*v. Barnhart*, 180 F. App'x 27, 29 (10th Cir. 2006) (finding error at step three, where the ALJ's

consideration of the plaintiff's cardiac condition was "limited to a one sentence conclusion

without any discussion of the medical evidence").  Nevertheless, the Tenth Circuit has made

clear that such error is harmless, where "confirmed or unchallenged findings made elsewhere in

the ALJ's decision confirm the step three determination under review."  *Fischer-Ross*, 431 F.3d

at 734.  Specifically, the ALJ could set forth adequate reasoning in other steps of his analysis,

which might "conclusively preclude [a plaintiff's] qualification under the listings at step three,"

such that "[n]o reasonable factfinder could conclude otherwise."  *Id.* at 735.

      Here, the ALJ's findings elsewhere in his decision clearly reject any notion that

Deherrera suffers from "chronic heart failure while on a regimen of prescribed treatment."  At

step two of his analysis, the ALJ acknowledged that Plaintiff "has experienced chest pain at

times," but observed that cardiac test results, dating back to 2009, were mostly unremarkable.

(AR 1518; *see* AR 219, 340, 1249.)  Importantly, paragraph A of Listing 4.02 sets out exacting

criteria, including the presence of "left ventricular end diastolic dimensions greater than 6.0 cm

or ejection fraction of 30 percent or less during a period of stability," or "left ventricular

posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left

atrium greater than or equal to 4.5 cm."  20 C.F.R., Pt. 404, Subpt. P., App. 1, § 4.02(A).  Here,

such evidence is "simply not present in the medical record."  *Fischer-Ross*, 431 F.3d at 735;

*McIntire v. Astrue*, No. 11-1178-SAC, 2012 WL 2395193, at *4 (D. Kan. June 25, 2012)

(affirming an ALJ's determination that the plaintiff's impairments did not meet Listing 4.02,

where the plaintiff's own treating physician "did not indicate that [the] plaintiff had any

restrictions or limitations" relating to congestive heart failure).

Deherrera does reference a February 25, 2019 Lexiscan MPI study, which revealed "[s]evere global hypokinesis with a calculated gated ejection fraction of 25 %," as evidence that he "meets the requirement for establishing Systolic heart failure set forth in Listing 402A1." (Op. Brief 38; *see* AR 2066.)  Plaintiff contends that the ALJ committed clear legal error, because he "failed to make any findings at all" with respect to the 2019 cardiac test results.  (Op. Brief 38.)  The court agrees that there is relevant evidence in the record suggesting that, as of February 2019, Plaintiff's left ventricular ejection fraction was below normal range.  (*See* AR 2066.)  However, the record is replete with other relevant evidence to the contrary.  Most notably, an echocardiogram, which was conducted six days prior to the Lexiscan MPI study, revealed Plaintiff's left ventricular ejection fraction to be "60-65%," which is well within normal range.  (AR 1921.)  Even more importantly, Deherrera's own cardiologist, who ordered both cardiac studies, interpreted the collective results as showing Plaintiff's ejection fraction to be within normal range.  (AR 1975; *see* AR 1986.)  The court finds that "a reasonable mind might accept [this evidence] as adequate to support" the ALJ's decision.  *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").  Faced with such evidence, the ALJ appropriately made a "choice between two conflicting views." *Id.* ("We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.") (alterations and internal quotation marks omitted); *see also Rivera v. Colvin*, 629 F. App'x 842, 843 (10th Cir. 2015) ("[W]here the evidence supports contrary findings, we will not disturb the ALJ's choice between them even if we would have made a different decision.").

Further, with respect to paragraph B of Listing 4.02, the ALJ included information in his decision regarding Plaintiff's admitted activities of daily living.  (AR 1526.)  This information supports the conclusion that Plaintiff's cardiac impairment does not "very seriously limit his ability to independently initiate, sustain, or complete activities of daily living[.]"  20 C.F.R. Pt. 404, Subpt. P., App. 1, § 4.02(B)(1).  And, the record is devoid of any congestive heart failure diagnosis, much less evidence of three acute episodes of congestive heart failure in a 12-month period.  20 C.F.R. Pt. 404, Subpt. P., App. 1, § 4.02(B)(2).  Nor do Plaintiff's medical records reflect the requirements set forth in Listing 4.02(B)(3).  *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.02(B)(3) (specifying an inability to perform an exercise tolerance test at a workload equivalent to 5 METs or less, due to various possible factors).  Indeed, in challenging the ALJ's step three determination, Deherrera does not even specify which of the paragraph B criteria that he claims to have satisfied.  *See Pendleton v. Colvin*, No. CIV-14-348-M, 2015 WL 5009790, at *6 (W.D. Okla. July 24, 2015) (finding no error in the ALJ's step three analysis, where there was "no evidence in the record to support a finding" that the plaintiff met the requirements of paragraph B of Listing 4.02).

On this record, then, the ALJ's confirmed findings at other steps of his analysis, coupled with "indisputable aspects of the medical record," conclusively preclude Plaintiff's qualification under the listings at step three.  *Fischer-Ross*, 431 F.3d at 735; *see Walters v. Colvin*, 604 F. App'x 643, 647 (10th Cir. 2015) ("Evidence to establish the criteria for listing 11.14 is 'simply not present in the medical record,' so the ALJ did not err in the step-three determination.").  Accordingly, the court finds no error as to this issue.

## II.  Development of the Record

Deherrera next argues that the ALJ committed legal error, by denying his claim for benefits without adequately developing the record.  (Op. Brief 39-42.)  On this issue, Plaintiff contends, specifically, that the ALJ did not elicit enough information from him at the 2019 hearing, "especially with regard to the non-exertional effects of [his] many impairments, and as to the devolving state of his overall functioning."  (*Id.* at 40.)  Deherrera is adamant that the ALJ should have explicitly "address[ed] the functional effects and inconsistencies raised by" recent cardiological and musculoskeletal testing results, "by questioning Mr. Deherrera about the fatigue, hypoxia and pain resulting from his spinal and cardiac impairments."  (*Id.* at 41.)  Plaintiff likewise contends that the ALJ's resulting decision, which "distilled 363 pages of medical records into two single-spaced pages," did not adequately explain the ALJ's finding that Plaintiff "was able to work at a light exertional level for eight hours a day, five days a week, despite the test results."  (*Id.*)

"The burden to prove disability in a social security case is on the claimant, and to meet this burden, the claimant must furnish medical and other evidence of the existence of a disability."  *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (quoting *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004)) (alterations omitted).  "A social security disability hearing is nonadversarial, however, and the ALJ bears responsibility for ensuring that 'an adequate record is developed during the disability hearing consistent with the issues raised.'"  *Id.* (quoting *Branum*, 385 F.3d at 1271).  This duty exists even when a claimant is represented by counsel. *Wall v. Astrue*, 561 F.3d 1048, 1063 (10th Cir. 2009) (quoting *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007)).

That said, "an ALJ's duty to develop the record is not unqualified." *Id.* (citation omitted). Indeed, "[s]everal preconditions inform an ALJ's duty to develop the administrative record." *Id.* (citation omitted). The ALJ "may reasonably rely on counsel to identify the issue or issues requiring further development." *Id.* (quoting *Branum*, 385 F.3d at 1271). Further, although a claimant need only "raise" the issue that he seeks to develop, that issue must still be "substantial" on its face. *Id.* (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997)). "Specifically, the claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists." *Id.* (quoting *Flaherty*, 515 F.3d at 1071).

Here, the court is satisfied that the ALJ fulfilled his duty to develop the record consistent with the issues raised by Deherrera. Importantly, to the extent that Plaintiff argues that the hearing record is inadequate regarding his allegations of "fatigue, hypoxia and pain resulting from his spinal and cardiac impairments," his attorney could have asked additional questions at the hearing to clarify such issues. *See Gay v. Sullivan*, 986 F.2d 1336, 1340 n.2 (10th Cir. 1993) ("Counsel could have probed the witness about the source's reliability and acceptance in the profession, but he did not do so, and now our assessment of such matters is effectively foreclosed."); *see also Wall*, 561 F.3d at 1063 (observing that, under normal circumstances, the ALJ may reasonably rely on "counsel to identify the issue or issues requiring further development"); *Maes*, 522 F.3d at 1097 ("Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record—indeed, to exhort the ALJ that the case is ready for decision—and later fault the ALJ for not performing a more exhaustive investigation.").

Further, to the extent that Plaintiff argues that the ALJ's decision did not adequately "address the functional effects and inconsistencies raised by" certain test results, the court disagrees.  (Op. Brief 41.)  Although it is true that an ALJ cannot simply ignore evidence that he does not like, the ALJ is not obligated to discuss every piece of evidence in the record.  "Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton*, 79 F.3d at 1009-10.

Here, Plaintiff argues that the ALJ failed to "explain the basis for his rejection of undisputed evidence" concerning: (1) a January 14, 2019 MRI scan of Plaintiff's lumbar spine; (2) a February 19, 2019 echocardiogram; and (3) a February 25, 2019 Lexiscan MPI study.  (Op. Brief 41; *see* AR 1975, 2066-68.)  However, in his written decision, the ALJ accurately recounted the results of the 2019 MRI, which showed a "stable MRI of the lumbar spine compared to a March 27, 2014 MRI; congenital lumbar spinal stenosis [] again noted; desiccated bulging disc with broad-based disc protrusion and osteophyte with facet arthropathy at L5-S1 and severe foraminal narrowing bilaterally with compression of the L5 nerve roots bilaterally; moderate bulging disc and bilateral facet arthropathy with moderate foraminal narrowing bilaterally L3-4 and L4-5; moderate bulging disc and facet arthropathy at L1-2 and L2-3 with mild canal stenosis and short pedicles with mild foraminal narrowing bilaterally, no change." (AR 1524; *see* AR 2067-68.)  Given that the 2019 MRI did not reveal any significant changes in Plaintiff's lumbar spine, as compared to the 2014 MRI, the evidence was not "significantly probative."  *See Davis v. Astrue*, 237 F. App'x 339, 342 (10th Cir. 2007) (finding no error in ALJ's failure to discuss certain evidence that was largely cumulative of other evidence in the

record); *Alba v. Colvin*, No. 14-cv-01143-MJW, 2015 WL 3746407, at *1 (D. Colo. June 15, 2015) (holding that the ALJ "did not need to explain his decision to disregard" certain evidence in the record, which was not "significantly probative").  The ALJ more than fulfilled his duty here, by summarizing the 2019 MRI findings, and by correctly noting Plaintiff's record of "conservative treatment and typically mild exam findings."  (AR 1526.).

Although the ALJ did not expressly discuss the 2019 echocardiogram, or the 2019 Lexiscan MPI, any error thereto was harmless.  First, as stated *supra*, while the Lexiscan MPI results do reasonably suggest that, as of February 2019, Plaintiff's ejection fraction range was below normal, there is conflicting evidence in the record that reasonably suggests his ejection fraction was, in fact, within normal range.  *See Clifton*, 79 F.3d at 1009-10 (stating that the ALJ "must discuss the *uncontroverted* evidence he chooses not to rely upon") (emphasis added).  Further, the 2019 echocardiogram results, as interpreted by Plaintiff's treating cardiologist,[5] revealed only "moderate concentric LVH [left ventricular hypertrophy]," ejection fraction within normal range, a "mildly enlarged RV [right ventricle]," and "trace MR [mitral regurgitation]." (AR 1975.)  In his written decision, the ALJ accurately recounted the cardiologist's determination, subsequent to reviewing the echocardiogram results, that "[m]any of [Deherrera's] problems including shortness of breath/restrictive lung defect and moderate LVH are due to his morbid obesity and will greatly benefit from weight loss."  (AR 1524; *see* AR 1977.)  Plaintiff, for his part, has failed to identify any significantly probative evidence that the ALJ ignored or overlooked.  Accordingly, the court finds no error with respect to this issue,

---

[5] Although the 2019 echocardiogram findings are referenced in a contemporaneous treatment record from Plaintiff's cardiologist, the court is unable to locate the echocardiogram report, itself, within the record.

either.  *See Watson v. Barnhart*, 194 F. App'x 526, 530 (10th Cir. 2006) (rejecting a plaintiff's

argument that the ALJ "ignored various parts of the record regarding her shoulder impairment

and back pain," where the ALJ summarized the treatment records, and correctly noted that the

plaintiff was given "several forms of conservative care for her back pain"); *Terrell v. Berryhill*,

No. 16-cv-02566-MEH, 2017 WL 1352275, at *5 (D. Colo. Apr. 13, 2017) ("If a party does not

identify the specific evidence the ALJ should have developed, such omission ends the party's

duty-to-develop argument."); *see also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1173 (10th Cir.

2012) (holding the ALJ's failure to mention a non-dispositive factor to be harmless error).

### III.  Evaluation of Medical Opinions

Plaintiff also argues that the ALJ's RFC determination is not supported by substantial

evidence, because he failed to properly evaluate and weigh the medical opinion evidence of

record.  (Op. Brief 42-46.)  Specifically, Plaintiff challenges the ALJ's consideration of a

"Physical Medical Assessment Questionnaire," which was completed by his treating physician,

Dr. Joseph Quintana, on April 18, 2018.  (*Id.* at 42; *see* AR 1754-56.)

An ALJ has a duty to evaluate and assign weight to all medical opinions in the record.

*Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (quoting *Keyes-Zachary*, 695 F.3d at 1161).

"[T]he weight given each opinion will vary according to the relationship between the disability

claimant and the medical professional."  *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir.

2004).  Generally, medical opinions from treating sources are given "more weight" than those

from non-treating sources.  *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see*

*Hamlin*, 365 F.3d at 1215 ("The treating physician's opinion is given particular weight because

of his [or her] 'unique perspective to the medical evidence that cannot be obtained from the

objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").  "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (citing 20 C.F.R. §§ 404.1527(d)(1), (2) and 416.927(1), (2). "[I]n appropriate circumstances," however, opinions from agency physicians "may be entitled to greater weight than the opinions of treating or examining sources."  *Pacheco v. Colvin*, 83 F. Supp. 3d 1157, 1164 (D. Colo. 2015) (quoting SSR 96-6p, 1996 WL 374180, at *3 (SSA July 2, 1996)).

In evaluating a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct.  *See Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  At step one, the ALJ must determine whether the opinion is conclusive—that is, whether it is to be accorded "controlling weight" on the matter to which it relates.  *Id.* (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)).  In doing so, the ALJ must first consider whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  *Id.*  If the opinion is not supported by medically acceptable evidence, then "the inquiry at this stage is complete."  *Watkins*, 350 F.3d at 1300.  However, if the ALJ "finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record."  *Id.* (citation omitted).  If both conditions are met, the ALJ must give the opinion "controlling weight."  *Krauser*, 638 F.3d at 1330.  "If the opinion is deficient in either of these respects, it is not to be given controlling weight."  *Id.*

If the ALJ declines to afford controlling weight to a treating physician's opinion, or if the opinion is from a non-treating source, the ALJ must determine, at step two, the appropriate amount of weight to give the opinion. *Id.* (citing *Watkins*, 350 F.3d at 1300-01); *see also Mays*, 739 F.3d at 578 (stating that the ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight he assigns to them"). In doing so, the ALJ must "make clear" how much weight he assigns the opinion, and provide "good reasons" for the weight assigned. *Vallejo v. Berryhill*, 849 F.3d 951, 955 & n.2 (10th Cir. 2017) (quoting *Watkins*, 350 F.3d at 1300); *see* 20 C.F.R. 426.927(c)(2). At this stage of the inquiry, "[t]reating source opinions are still entitled to deference." *Krauser*, 638 F.3d at 1330 (citing *Watkins*, 350 F.3d at 1300-01).

In determining the amount of weight to assign to any medical opinion, the ALJ must consider the relevant factors set out in 20 C.F.R. §§ 404.1527 and 416.927. *Langley*, 373 F.3d at 1119 (quoting *Watkins*, 350 F.3d at 1300); *see Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (explaining that this requirement applies equally to examining source opinions). Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Allman v. Colvin*, 813 F.3d 1326, 1331-32 (10th Cir. 2016) (citing *Watkins*, 350 F.3d at 1301). Although the ALJ must consider each factor in weighing a medical opinion, he is not required to engage in an explicit factor-by-factor analysis, so long as his written decision is "sufficiently specific to make clear to any subsequent reviewers that weight the adjudicator gave to the []

opinion and the reason for that weight." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (quoting *Watkins*, 350 F.3d at 1300). "Finally, if the ALJ rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing so." *Watkins*, 350 F.3d at 1301 (citing *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)).

### A.  *2018 Opinion from Dr. Joseph Quintana*

Dr. Joseph Quintana, a primary care physician, treated Plaintiff for a bevy of ailments—including joint pain, diabetes, hypertension, edema, sciatica, and breathing issues—on a semi-regular basis, from January 2015, until June 2019.  (*See, e.g.,* AR 768-804, 1219-1340, 1396-1439, 1447-1511, 1964-72.)  On April 18, 2018, Dr. Quintana completed a "Physical Medical Assessment Questionnaire" on Plaintiff's abilities.  (AR 1754-56.)  In that questionnaire, Dr. Quintana reported that, due to "severe spinal stenosis of [the] lumbar spine," Deherrera could stand or walk for less than two hours within an eight-hour workday.  (AR 1754.)  Dr. Quintana likewise reported that, even with normal breaks, Plaintiff could sit for only four hours within an eight-hour workday.  (*Id.*)  He restricted Plaintiff to lifting and carrying no more than ten pounds frequently, and no more than twenty pounds on occasion.  (*Id.*)  In addition, Dr. Quintana indicated that Plaintiff must periodically alternate between sitting, standing, and walking throughout the day, so as to relieve discomfort.  (*Id.*)  Dr. Quintana reported that Plaintiff could sit, continuously, for up to ninety minutes maximum, and that he could stand, continuously, for up to thirty minutes maximum.  (*Id.*)  Dr. Quintana also reported that Deherrera is unable to walk more than 100 to 200 feet without the use of an assistive device.  (AR 1755.)  Next, Dr. Quintana checked a series of boxes indicating that Deherrera was completely unable to twist, stoop/bend, crouch, climb stairs, or climb ladders, and that he could operate bilateral foot controls for no

more than one-third of a normal workday.  (*Id.*)  Dr. Quintana additionally restricted Plaintiff to avoid any and all exposure to hazards, such as machinery or heights, and to avoid concentrated exposure to extreme temperatures, fumes, odors, or gasses.  (AR 1756.)  Dr. Quintana estimated that Deherrera would, on average, be absent from work more than three times each month, due to his impairments.  (*Id.*)  At the end of the opinion, Dr. Quintana wrote that Deherrera "need back surgery but his morbid obesity makes it too risky."  (*Id.*)  Dr. Quintana recorded his impression that, unless Plaintiff successfully lost over 100 pounds, he was "unlikely to get better."  (*Id.*)

### B.  The ALJ's Analysis of Dr. Quintana's Opinion

In his written decision, the ALJ expressly considered the 2018 opinion from Dr. Quintana.  (AR 1525-26.)  The ALJ identified Dr. Quintana, in an earlier portion of the analysis, to be a treating physician.  (AR 1521.)  The ALJ accurately recounted Dr. Quintana's findings as follows:

> [T]he claimant can lift/carry up to 20 pounds occasionally.  He can sit up to four hours and stand/walk less than two hours in an eight-hour workday.  He has to change positions often.  He requires a cane to ambulate.  He does not have any manipulative limitations.  He can operate foot controls bilaterally up to one-third of the workday.  He can never do any postural activities.  He can never be exposed to unprotected heights, moving mechanical parts, or pulmonary irritants.  He must avoid exposure to extreme cold/heat.  He will miss more than three days of work a month due to his impairments.

(AR 1525.)  The ALJ then assigned "little weight" to the "extreme limitations" set forth in Dr. Quintana's opinion, first noting that Dr. Quintana "did not explain how spinal stenosis and morbid obesity completely preclude postural activities."  (*Id.*)  In addition, the ALJ observed that "examination records after the opinions were issued generally note at most either mildly or moderately reduced lumbar range of motion or moderate pain with motion."  (*Id.*; *see, e.g.,* AR 1225, 1311, 1474.)  The ALJ also observed that, even though "use of a cane is noted in the

record," Plaintiff's "gait has sometimes been found normal."  (AR 1526; *see, e.g.,* AR 1224,

1328, 1474.)  In addition, the ALJ referenced Plaintiff's activities of daily living, as set forth in a

2012 adult function report—showing that Plaintiff goes outside daily, watches television "a

couples of hours each day," and that he is able to drive, dress himself, and use the toilet

unassisted.  (AR 1526; *see* AR 142, 144-45.)  Finally, the ALJ found that Dr. Quintana's specific

opinion—that Deherrera would miss more than three days of work each month—was "not

consistent with the record as a whole, which shows conservative treatment and typically mild

exam findings."  (AR 1526; *see* AR 1756.)

### C.  Plaintiff's Arguments

Plaintiff argues that the ALJ's erred by assigning only "little weight" to the opinion from

Dr. Quintana, and by failing to properly consider "essentially all" of the regulatory factors set out

in 20 C.F.R. §§ 404.1527 and 416.927.  (Op. Brief 42-46.)  However, the court finds no error in

the ALJ's assessment of Dr. Quintana's opinion.  In his written decision, the ALJ expressly

recounted certain portions of Plaintiff's treatment history with Dr. Quintana, clearly indicating

that Dr. Quintana was a treating source.  (AR 1521.)  Prior to discussing Dr. Quintana's opinion,

specifically, the ALJ extensively documented Plaintiff's roughly ten-year treatment history for

his numerous ailments, as well as the objective clinical findings.  (AR 1520-25.)  The ALJ then

accurately and fully summarized Dr. Quintana's 2018 opinion, addressing both the degree to

which the opinion was supported by relevant evidence, as well as the consistency between the

opinion and the record as a whole.  (AR 1525-56.)  The ALJ permissibly assigned little weight to

the "extreme" portions of the opinion—namely, that Plaintiff was completely precluded from all

postural activities, that he could walk only 100 to 200 feet without a cane, and that he stand for

less than two hours within a normal workday—because those specific opinions were inadequately supported, as well as inconsistent with Plaintiff's documented treatment history, including Dr. Quintana's own examination findings.  (*Id.*)  Importantly, to the extent that Dr. Quintana's opinions on Deherrera's functional limitations were found to be supported by, or consistent with, the objective medical evidence, those limitations were included in the ALJ's RFC assessment.  Most notably, the ALJ determined, consistent with Dr. Quintana's own stated opinion, that Plaintiff could sit for a total of four hours within an eight-hour workday.  (AR 1519 ¶ 5; *see* AR 1754.)  As such, to the extent that Deherrera challenges the ALJ's evaluation of Dr. Quintana's sitting limitation, the argument is without merit.  *See Thompson v. Colvin*, 551 F. App'x 944, 948 (10th Cir. 2014) ("A remand for the ALJ to weigh opinions that admittedly do not support a finding of disability would be futile.").  While the ALJ could have been more detailed in his analysis of the regulatory factors, it is clear that he evaluated the opinion in relation to those factors.  *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).  Plaintiff does not point to any evidence that establishes that particular, relevant factors were ignored by the ALJ.  And, as the Commissioner correctly points out, Plaintiff does not challenge any of the reasons given by the ALJ for discounting Dr. Quintana's standing, walking, and postural limitations, all of which were inconsistent with the ALJ's RFC determination, and might have changed the ALJ's ultimate decision, if adopted.  *See Keyes-Zachary*, 695 F.3d at 1161 ("We will consider and discuss only those . . . contentions that have been adequately briefed for our

review.").  On this record, then, the court finds no error in the ALJ's analysis of the medical

opinion evidence.[6]

## IV.  Functional Effects of Subjective Symptoms

Finally, Deherrera challenges the ALJ's evaluation of his subjective allegations regarding

the intensity, persistence, and limiting effects of his back pain and fatigue.  (Op. Brief 46-48.)

Plaintiff contends, specifically, that "there is objective evidence that [he] suffered back pain that

interfered with his ability to function," in the form of a 2019 MRI report, which he complains

"the ALJ rarely, if ever, addresses" in the RFC assessment.  (*Id.* at 47.)  According to Plaintiff,

"[w]hen the ALJ briefly discusses this evidence in his decision, he summarized it, but did not

directly address its functional effect, nor did he discuss its capacity to produce potentially

disabling pain, and he did not discuss why it did not factor in assigning the RFC."  (*Id.* at 47-48.)

Plaintiff also complains that the ALJ's RFC analysis "does not address the criteria set forth in

[20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)] for evaluating evidence, especially subjective

evidence."  (*Id.* at 48.)  Deherrera, thus, contends that the ALJ's RFC assessment lacks

substantial evidentiary support.  (*Id.* at 47.)  However, the court finds no merit to these

arguments.

In evaluating a claimant's RFC, the ALJ must consider all of the claimant's "symptoms,

including pain, and the extent to which [those] symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(a).

Relevant factors to this inquiry include: (1) the claimant's daily activities; (2) the location,

---

[6] To the extent that Plaintiff challenges the ALJ's evaluation of the remaining medical opinion
evidence, he has failed to develop any argument on that issue.

duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measure other than treatment used to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. *Guillar v. Comm'r, SSA*, --- F. App'x ----, 2020 WL 282274, at *3-4 (10th Cir. 2021) (citing SSR 16-3P, 2017 WL 5180304, at *7-8 (Oct. 25, 2017)). However, the regulations do not require the ALJ to discuss every factor listed in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). *See* SSR 16-3P, 2017 WL 5180304, at *8 ("If there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor in the determination or decision because it is not relevant to the case."). Further, the ALJ is not required to engage in a "formalistic factor-by-factor recitation of the evidence," as long as he "sets forth the specific evidence he relies on in evaluating the claimant's credibility." *Keyes-Zachary*, 695 F.3d at 1167 (quoting *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)).

Here, in his written decision, the ALJ first summarized the appropriate framework for evaluating Plaintiff's subjective allegations of pain. (AR 1519-20.) The ALJ then briefly recounted Deherrera's allegations, as set forth in his 2019 hearing testimony, including that he: (1) "can only raise his arms shoulder height due to pain;" (2) suffers "pain in his neck, back, elbows, hips, knees and feet;" (3) "can only sit up to 30 minutes and barely lift up to 10 pounds;" and (3) "uses a cane daily." (AR 1520.) Next, the ALJ concluded that Plaintiff suffered medically determinable impairments, which "could reasonably be expected to cause the alleged

symptoms." (*Id.*)  The ALJ then determined that Plaintiff's allegations of pain were "not entirely consistent with the medical evidence and other evidence in the record." (*Id.*)  In doing so, the ALJ specifically acknowledged that Deherrera "complained of back pain" in 2019.  (AR 1524.)  In addition, the ALJ accurately and extensively recounted the findings from Plaintiff's 2019 lumbar spine MRI, which revealed a "stable MRI of the lumbar spine compared to a March 27, 2014 MRI." (*Id.*)  The ALJ noted that certain examination records "showed reduced range of motion in the lumbar spine with pain, unstable gait, [and] ankle edema," as well as Plaintiff's occasional "use[] of a cane or crutches," while other examination records "showed full strength throughout, full range of motion, no edema, normal breathing and normal muscle tone." (*Id.*)  As such, the ALJ considered "[t]he location, duration, frequency, and intensity of [his] pain or other symptoms." SSR 16-3P, 2017 WL 5180304, at *7.  The ALJ likewise discussed 2019 treatment records indicating that Plaintiff's medical provider "encouraged him to follow-up with bariatric surgery," given that "many of his problems" were "due to his morbid obesity." (AR 1524.)  The ALJ, therefore, considered and discussed "[f]actors that precipitate and aggravate the symptoms." SSR 16-3P, 2017 WL 5180304, at *7.  In addition, the ALJ discussed Deherrera's treatment regimen, including that he "refused to consider recommended physical therapy or epidural steroid injections;" that he "decided to not proceed with bariatric surgery as he had lost 30 pounds over the past six months with diet and exercise;" and that his medical provider "told him that prescription narcotics would not be prescribed." (AR 1520.)  The ALJ, thus, considered the "type, dosage, effectiveness, and side effects of any medication [Deherrera] takes or has taken to alleviate pain or other symptoms," as well as the "[t]reatment, other than medication,

[that he] receives or has received for relief of pain or other symptoms."  SSR 16-3P, 2017 WL 5180304, at *8.

The court finds that the ALJ's analysis clearly and thoroughly examined Plaintiff's subjective allegations of pain, including his testimony concerning back pain and fatigue, appropriately linking that discussion to the relevant statutory factors.  Further, it appears that the ALJ, in formulating the RFC, accounted for Plaintiff's subjective symptoms regarding back pain and fatigue, by limiting Plaintiff to "lifting and carrying 20 pounds occasionally, 10 pounds frequently," and by allowing him "the use of a cane an[d] oxygen while working as he testified []he uses them daily and throughout the day."  (AR 1526.)  Plaintiff points to no evidence, beyond his own hearing testimony, to support a finding that the ALJ should have imposed additional restrictions.  *See Lee v. Colvin*, 631 F. App'x 538, 543-44 (10th Cir. 2015) (holding that the ALJ did not commit reversible error by failing to provide "more specific references" to "pain in the RFC analysis," where the "record contain[ed] very limited references" to pain, and where the ALJ ultimately restricted the claimant to light work, thereby "account[ing] for this limitation" in a way that was "consistent with the medical evidence"); *Hodges v. Colvin*, 568 F. App'x 639, 641 (10th Cir. 2014) (rejecting the argument that "the ALJ's RFC determination should have included [the plaintiff's] subjective complaints," where the ALJ found that the objective medical evidence did not support the plaintiff's "allegations concerning the . . . limiting effects of his pain," and where the plaintiff did not "point to any medical evidence indicating his RFC should be more limited").  Accordingly, the court rejects Dehererra's final point of contention.

## V.  Conclusion

In this case, the ALJ properly exercised his responsibility as fact finder to analyze the evidence, and his determination of Plaintiff's RFC is well-grounded in that analysis. For that reason, the decision of the Commissioner must be affirmed. *See Nguyen v. Shalala*, 43 F.3d 1400, 1403 (10th Cir. 1994) (The Commissioner's final decision "must be affirmed if it is supported by substantial evidence and correct legal standards were used."); *see also Vigil*, 805 F.3d at 1201 ("In reviewing the ALJ's decision, we neither reweigh the evidence nor substitute our judgment for that of the agency.") (internal quotation marks omitted).

Accordingly, it is

**ORDERED** that the Commissioner's final decision is **AFFIRMED**.

Dated this 30th day of March, 2021.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge